1  CHAPIN FITZGERALD SULLIVAN LLP
2   Edward D. Chapin, Esq. (SBN: 053287)
    echapin@cfslawfirm.com
3   Douglas J. Brown, Esq. (SBN: 248673)
    dbrown@cfslawfirm.com
4  550 West "C" Street, Suite 2000
5  San Diego, California 92101
6  Tel: (619) 241-4810
7  Fax: (619) 955-5318

8  Attorneys for Plaintiffs

9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA
11

12 Sandra L. Muñiz, *on behalf of herself*     ) Case No.:     **SACV11-00259 CJC (MLGx)**
   *and all others similarly situated,*        )
13                                             )
                          Plaintiff,           ) **Class Action Complaint for:**
14                                             )
           vs.                                 )
15                                             )   1. Fraud
   **Corinthian Colleges, Inc.;** Corinthian   )   2. Negligent Misrepresentation
16 Colleges, Inc., d/b/a Everest College;      )   3. Violation of the Unfair Trade
17 Corinthian Colleges, Inc., d/b/a Everest    )      Practices Act;
   University; Corinthian Colleges, Inc.,      )   4. Violation of the False
18 d/b/a Everest Institute; Corinthian         )      Advertising Act;
19 Colleges, Inc., d/b/a Everest College of    )   5. Violation of the Consumer
   Business, Technology and Health Care;       )      Legal Remedies Act;
20 Heald College, LLC; and Heald               )   6. Breach of Implied Contract; and
21 Capital, LLC,                               )   7. Breach of the Implied Covenant
22                                             )      of Good Faith and Fair Dealing.
                          Defendants.          )
23                                             ) **Jury Trial Demanded**
24 _____    )

25                          By Fax

26
27
COPY 28
                                   1

1       1.     This is a putative class action on behalf of individuals who enrolled

2  in or attended classes at institutions operated by Defendant Corinthian Colleges,

3  Inc. ("Corinthian").

4       2.     Corinthian is a for-profit higher education company, founded in

5  1995 and headquartered in Santa Ana, California, that owns and operates a

6  number of academic institutions, including Defendants Corinthian Colleges, Inc.,

7  d/b/a Everest College; Corinthian Colleges, Inc., d/b/a Everest University;

8  Corinthian Colleges, Inc., d/b/a Everest Institute; and Corinthian Colleges, Inc.,

9  d/b/a Everest College of Business, Technology and Health Care (collectively,

10  "Everest") and Heald College, LLC and Heald Capital, LLC (collectively,

11  "Heald"). As of September 30, 2010, Corinthian had enrolled more than 113,800

12  students throughout the United States and Canada, over 99% of whom are

13  enrolled at Everest or Heald.

14  **Summary of the Action**

15       3.     Through a scheme centered around federal student financial aid,

16  Corinthian is systematically violating California law in the name of profit and at

17  the expense of its students, the federal government, and, consequently, the

18  American taxpayers.  Mimicking the subprime mortgage lenders that recently

19  brought on the near-collapse of the American economy, Corinthian has based its

20  scheme on (1) a source of easy credit; (2) a consumer population that it can

21  exploit as its pawns; and (3) a means of tapping into that easy credit through

22  those pawns without exposing itself to the inevitable downside credit risk it

23  creates.

24       4.     Without regard for the truth or the law, Corinthian uses fraudulent

25  misrepresentations to entice prospective students to enroll.  These deceptive

26  marketing practices are working, as reflected by the explosive growth in

27  Corinthian's total student enrollment from 69,200 on September 30, 2008 to

28

1  113,818 on September 30, 2010 – a net 64.5% increase over a two-year period.

2  By 2009, Corinthian's revenues had grown to $1.3 billion.

3      5.      The driving force behind Corinthian's growth and the fuel for its

4  profiteering scheme is Title IV[1] federal financial aid, which accounted for 89% of

5  Corinthian's revenue in 2009.  Corinthian systematically takes advantage of its

6  students throughout the financial aid process – misrepresenting and omitting

7  material facts, inducing these students to take on loan obligations that they

8  cannot fulfill and that they would not accept if the defendants had not misled

9  them.

10     6.      Because federal law caps the percentage of revenue an educational

11 institution can receive from Title IV funding at 90%, and because military tuition

12 assistance programs such as the Post-9/11 GI Bill do not count towards this cap,

13 Corinthian targets veterans and active military personnel to fill the remainder of

14 its student body.

15     7.      One independent analysis has estimated that Corinthian's 3-year

16 student loan default rate may be as high as 39%.  This means that nearly 2 out of

17 every 5 Corinthian students will default on their loans within three years.  On its

18 face, this default rate signals that Corinthian is burdening its students with

19 financial obligations that their educations are not equipping them to repay.

20 Student loans are ordinarily not dischargeable even through bankruptcy, leaving

21 these Corinthian students who cannot repay their loans saddled with loans they

22 can never escape.  Because student loans are federally guaranteed, Corinthian

23 profits whether its students default on their loans or not.

24 /////

25 /////

26

27

28

---

[1] Title IV of the Higher Education Act of 1965 ("Title IV"), 20 U.S.C. § 1070, *et seq.*, covers the administration of United States federal student financial aid programs.

1    8.     United States Senator Richard Durbin of Illinois summarized the

2  unfair and unlawful business practices of for-profit academic institutions like

3  Corinthian during a Congressional floor speech on September 28, 2010:

> They are, by and large, a marketing operation: bring the
> students in, sign them up, bring in the Federal dollars; bring
> in more students, sign them up, bring in more Federal
> dollars. . . . [They] are sinking young people deeply into debt
> in student loans that they can never pay off, promising them
> courses, training, and degrees that will lead to a good job
> and, in fact, it leads to a dead end, where they end up with a
> worthless piece of paper.  They don't end up with the skills
> they need to get a job, but they do end up in debt, with
> student loans to the heavens.

12    9.     Within the past year, other institutions have unearthed evidence of

13  Corinthian's wrongdoing, including the United States Department of Education,

14  the Government Accountability Office, and the Higher Learning Commission, a

15  national accreditation agency.  This action seeks to recover damages inflicted by

16  and bring an end to Corinthian's unlawful profiteering.

## Jurisdiction and Venue

18    10.    The Court has jurisdiction over this action under, 28 U.S.C. §

19  1332(d)(2)(A), because it is a class action for which minimal diversity exists and

20  the amount in controversy exceeds $5 million, exclusive of interest and costs.

21    11.    Venue in this Court is proper, under 28 U.S.C. § 1391(a)(2),

22  because Corinthian is headquartered and maintains its principal place of business

23  in Santa Ana, California; because a substantial portion of the wrongs alleged

24  occurred in this district; and because Corinthian has received substantial

25  compensation by engaging in numerous business activities within this district.

## The Parties

27    12.    Plaintiff Sandra L. Muñiz ("Plaintiff"), a citizen and resident of

28  California, began attending Heald College, LLC's campus in Rancho Cordova,

California in 2007.  After completing a business skills program certificate in 2008, she was unable to get a job and decided to enroll in Heald's paralegal program.  She withdrew from the paralegal program after four weeks, dissatisfied because she was never assigned any homework or given any materials to study, and transferred to Heald's Roseville campus to study criminal justice.  Through the course of her study at Heald, Plaintiff has taken out roughly $19,000 in student loans.  Due to her inability to gain employment with her Heald certification and due to the poor quality of the instruction she received, Plaintiff asked Heald to refund the lenders the amount of her loans.  Heald refused.

13.     Defendant Corinthian Colleges, Inc. ("Corinthian") is a for-profit higher education company, founded in 1995 and headquartered in Santa Ana, California, that owns and operates a number of academic institutions, including Defendants Corinthian Colleges, Inc., d/b/a Everest College; Corinthian Colleges, Inc., d/b/a Everest University; Corinthian Colleges, Inc., d/b/a Everest Institute; and Corinthian Colleges, Inc., d/b/a Everest College of Business, Technology and Health Care (collectively, "Everest") and Heald College, LLC and Heald Capital, LLC (collectively, "Heald").  Corinthian held an initial public offering on February 5, 1999, and is one of the largest publicly-traded for-profit college entities in the United States, operating 103 colleges and two continuing education centers in 25 states along with 17 colleges in Ontario, Canada.  As of September 30, 2010, Corinthian had enrolled more than 113,800 students throughout the United States and Canada, over 99% of whom are enrolled at Everest or Heald.

14.     Defendant Corinthian Colleges, Inc., d/b/a Everest College ("Everest College") is a for-profit entity owned and operated by Corinthian. Everest College campuses are located throughout the United States and offer diploma or associate degree programs in health care, business, and computer

1  technology.  Everest College also offers online degree programs through "Everest

2  University Online."

3      15.    Defendant Corinthian Colleges, Inc., d/b/a Everest Institute

4  ("Everest Institute") is a for-profit entity owned and operated by Corinthian.

5  There are approximately 27 Everest Institute campuses throughout the United

6  States, offering diploma programs in health care, business, computer technology,

7  electronics, and heating, ventilation, and air conditioning.

8      16.    Defendant Corinthian Colleges, Inc., d/b/a Everest University

9  ("Everest University") is a for-profit entity owned and operated by Corinthian.

10  Formerly known as Florida Metropolitan University, Everest University now has

11  campuses located throughout the United States.  Everest University also offers

12  online degree programs through "Everest University Online."

13      17.    Defendant Corinthian Colleges, Inc., d/b/a Everest College of

14  Business, Technology and Health Care ("Everest College of Business,

15  Technology and Health Care") is a for-profit entity owned and operated by

16  Corinthian.  There are approximately 17 Everest College of Business,

17  Technology and Health Care campuses in Ontario, Canada.

18      18.    Defendant Heald College, LLC ("Heald") was founded as a non-

19  profit university in San Francisco, California in 1863 before being later converted

20  into a for-profit university known as "Heald Business College."  Today, Heald

21  operates campuses in eleven California cities along with Portland, Oregon and

22  Honolulu, Hawai'i.  Heald offers associate's degrees and certificates in 34 fields.

23  In November 2009, Corinthian purchased Heald for $395 million and announced

24  plans to convert Heald into an online-only institution.

25      19.    Defendant Heald Capital, LLC is Heald's parent company and a

26  subsidiary of Corinthian.

27  /////

28  /////

**Class Action Allegations**

20.    Plaintiff brings this action on behalf of herself and as a class action, under Federal Rules of Civil Procedure 23(a) and 23(b), on behalf of the following class :

> All persons in the United States and Canada who, during the period from January 31, 2005 through the present (the "Everest Class Period"), enrolled in or attended classes offered by Corinthian through any of its Everest academic institutions (the "Everest Subclass"); and
>
> All persons in the United States who, during the period from January 31, 2009 through the present (the "Heald Class Period"), enrolled in or attended classes offered by Heald (the "Heald Subclass").
>
> Excluded from the Everest Subclass and the Heald Subclass are the defendants; their immediate families, subsidiaries, affiliates, successors-in-interest, representatives, trustees, executors, administrators, heirs, assigns, or transferees; any person acting on behalf of the defendants; all governmental entities; and co-conspirators.

21.    The exact number of class members is in the exclusive control of the defendants. As of September 30, 2010, the current enrollment at Corinthian's institutions was 113,818 students. On information and belief, Plaintiff alleges that there are hundreds of thousands of class members, geographically dispersed throughout the United States and Canada, such that joinder of all class members is impracticable.

22.    Plaintiff's claims are typical of the claims of the class in that:

(a)    Plaintiff was enrolled in a degree program offered by Heald during the Heald Class Period;

(b)    Plaintiff was induced to enroll in this degree program by uniform affirmative written misrepresentations published by Corinthian;

1  uniform scripted affirmative oral misrepresentations made by Corinthian's

2  enrollment advisors; and by Corinthian's material omissions;

3        (b)    Plaintiff was induced to enroll in the online degree program by

4  identical affirmative written misrepresentations published by Bridgepoint,

5  uniform scripted affirmative oral misrepresentations made by Bridgepoint

6  enrollment advisors, and through the defendants' material omissions;

7        (c)    Plaintiff and all class members were damaged by the same

8  wrongful conduct of the defendants and their co-conspirators, as alleged in

9  this action; and

10        (d)    the relief sought is common to the class.

11      23.    The defendants' unfair and deceptive conduct gives rise to several

12  questions of law or fact that are common to the class.  Among such questions

13  arising in this action are:

14        (a)    whether the defendants misrepresented material facts about

15  their academic institutions to the class;

16        (b)    whether the defendants misrepresented material information

17  about student loan eligibility and requirements to the class;

18        (c)    whether the defendants recruited class members to attend one

19  of Corinthian's academic institutions;

20        (d)    whether class members enrolled in or attended classes offered

21  by one of Corinthian's academic institutions;

22        (e)    whether the defendants improperly or illegally provided

23  incentive payments to their enrollment advisors;

24        (f)    whether the defendants improperly or illegally targeted

25  veterans or active duty military personnel through their deceptive

26  marketing practices;

27        (g)    whether the defendants engaged in unfair or unlawful business

28  practices during the Everest Class Period or the Heald Class Period;

Class Action Complaint (*Muñiz v. Corinthian Colleges, Inc., et al.*)

    (h) whether the defendants engaged in unfair or unlawful deceptive marketing practices, including false advertising, during the Everest Class Period or the Heald Class Period;

    (i) whether the defendants had a duty to disclose and failed to disclose material facts to class members;

    (j) whether the defendants breached the implied covenant of good faith and fair dealing implied in their student enrollment contracts; and

    (l) whether class-wide damages, declaratory, or injunctive relief is appropriate and, if so, the proper measure of the damages, declaratory, or injunctive relief.

24. These questions of law or fact are common to the class and predominate over any questions affecting only individual class members.

25. Plaintiff will fairly and adequately represent the interests of the class in that:

    (a) Plaintiff is a typical former student of the defendants' degree programs;

    (b) the defendants induced Plaintiff to enroll in one of their degree programs through deceptive marketing and unfair business practices; and

    (c) Plaintiff has no conflicts with any other member of the class.

26. Plaintiff has retained competent counsel experienced in class action litigation.

27. A class action is superior to other alternatives, if any exist, for the fair and efficient adjudication of this controversy.

28. The prosecution of separate actions by individual class members would create risks of inconsistent or varying adjudications and of establishing incompatible standards of conduct for the defendants.

29.     Injunctive relief is appropriate as to the class as a whole because the defendants have acted or refused to act on grounds generally applicable to the entire class.

30.     Plaintiff reserves the right to expand, modify, or alter the class definition in response to information learned during discovery.

## Factual Allegations

31.     Having identified the opportunity to tap into easy credit while shielding itself from its students' student loan defaults, Corinthian entices prospective students to enroll and apply for students loans they cannot pay back through a systematic, deceptive marketing scheme.  It conducts this scheme in large part through its publications and enrollment advisors.

32.     Through its various websites, Corinthian deceives students about federal financial aid, the true cost of attending Everest and Heald, the value of Everest's accreditations, the quality and reputation of its academic programs, and the employment prospects and career placement services its graduates can expect. It does this by improperly hiding information from visitors to its websites and by misleading students through affirmative misrepresentations and material omissions.

33.     Corinthian also trains and deploys an army of aggressive, persistent enrollment advisors to reach out and recruit students directly.  Schools that participate in Title IV federal financial aid programs, like Everest and Heald, are prohibited from providing incentive payments to employees for securing student enrollment.  Corinthian aims to skirt this regulation by fostering a hyper-competitive environment in which its enrollment advisors' successes or failures are determined not by the accuracy or quality of advice given to prospective students, but by the number of prospective students these advisors ultimately enroll. Predictably, the result is that Corinthian's enrollment advisors dispense false and misleading information to secure enrollments.

1    34.    Collectively, these tactics drive Corinthian's enrollment practices and

2   work to the company's great financial benefit, at the expense of its students, the

3   federal government, and the American taxpayers.  Because Corinthian is not held

4   accountable for its graduates' performance on the job market, and because the

5   government's guarantee on federal student loans immunizes Corinthian from the

6   dangerous credit risks it encourages students to take on, the deceptive marketing

7   practices of Corinthian and its subsidiary academic institutions, Everest and

8   Heald, have gone unchecked until the filing of this action.

9   **Corinthian Misleads Students About Federal Financial Aid.**

10    35.    Perhaps Corinthian's most pernicious deception concerns federal

11   financial aid.  Through written misrepresentations, uniform scripted oral

12   misrepresentations, and material omissions, Corinthian misleads students about:

13              (a)    the fact that loans are disbursed directly to Everest and Heald,

14          obligating students to repay their loans immediately upon enrollment;

15              (b)    the fact that Everest illegally delays disbursement of students'

16          federal loans;

17              (c)    the maximum allowable amount of financial aid for which

18          prospective students may qualify;

19              (d)    the fact that many of Corinthian's schools are in violation of

20          Title IV's "90/10 Rule," putting students at risk of losing the ability to

21          finance their educations through federally financial aid programs;

22              (e)    their eligibility for federal Pell Grants in addition to student

23          loans;

24              (f)    the fact that Corinthian students default on their loans at a

25          rate over three times the national average; and

26              (g)    the fact that federal student loans are not dischargeable in

27          bankruptcy.

28

Class Action Complaint (*Muñiz v. Corinthian Colleges, Inc., et al.*)

36.     Based on uniform scripts and instructions provided to them, Corinthian's enrollment advisors and financial aid officers pressure prospective students to enroll in a degree program before completing their applications for federally funded student loans.  During this process, Corinthian fails to disclose to prospective students that its students' loans are disbursed directly to the school instead of to the students themselves, as is customary.  This allows Corinthian's institutions to demand repayment immediately upon enrollment and prevents students from being able to defer payment until after graduation.

37.     This omission is material because knowledge of the obligation to enter repayment immediately would have affected students' decisions to enroll at Everest or Heald and to finance their educations through federal loans.  Many of Everest's and Heald's students have lower incomes, as evidenced by their ability to qualify for federal financial aid, and made strategic decisions to attend school full-time to invest in their educations rather than seeking wage-earning employment.  Such decisions were affected by Corinthian's suppression of the material fact that students become responsible for immediately repaying their loans while attending school.

38.     Corinthian also fails to disclose to prospective students that Everest improperly delays disbursement of students' federal loan funds.  In April 2010, the United States Department of Education found that Everest illegally "delayed disbursement of Title IV funds" in order to generate interest income for itself.  This undisclosed material fact, had it been disclosed, would have affected students' decisions to apply for student loans or to attend Everest at all.

39.     In the same April 2010 report, the Department of Education found that Everest uniformly "failed to make students aware of the total amounts of financial aid to which they were entitled."  In particular, the report noted that Everest misled students about the maximum annual federal student loan limit for which students could apply and federal Pell Grants for which they may have been

1    eligible.  Corinthian made this uniform misrepresentation to students in order to

2    induce them to pay for more of their educations with private financing or out of

3    their own pockets rather than with federal financial aid.

4          40.      Corinthian's motivation for this deception stems from its consistent

5    violation of Title IV's "90/10 Rule," which prohibits for-profit colleges from

6    deriving more than 90% of their funding from certain federal sources.  As

7    Corinthian itself stated in its Q3 2010 Form 10-Q, Everest has been in actual or

8    proximate violation of the "90/10 Rule" for years.  Only a temporary recalculation

9    of the rule for fiscal year 2010 by the Higher Education Authority shielded

10   Everest from the risk of losing all of its Title IV funding:

11               . . . the percentage of our revenue on a cash basis attributable
12               to Title IV funds has increased significantly over our past two
             completed fiscal years.  Without the temporary relief
13           imposed by the HEOA, approximately 89.8% of our net U.S.
14           revenues (on a cash basis) would have been derived from
             federal Title IV programs in fiscal 2010, and 42 of our 49
15           institutions would have exceeded the 90% threshold.  When
16           the first portion of 90/10 relief under the HEOA expires for
             our fiscal year ended June 30, 2010 (starting July 1, 2011),
17           however, compliance will be much more difficult. . . .  If any
18           of our institutions, depending on its size, loses eligibility to
             participate in federal student financial aid programs, it could
19           have a material adverse effect on our business.
20

21         41.      In the same Q3 2010 Form 10-Q, Corinthian explained a major

22   reason for its schools' non-compliance:

23               Effective July 1, 2008, the annual unsubsidized Stafford loans
24               available for undergraduate students under the FFEL
             program increased by $2,000.  This increase, coupled with
25           recent increases in grants from the Pell program and other
26           Title IV loan limits, has resulted in our schools experiencing
             an increase in the revenues they receive from Title IV
27           programs. . . .  As a result of [these] increases in student loan
28           limits and expanded eligibility for, and increases in, the

maximum amount of Pell Grants, the percentage of our
revenue on a cash basis attributable to Title IV funds has
increased significantly over our past two fiscal years.

42.     Motivated by its need to keep the percentage of its revenues coming
from Title IV programs within the 90% threshold, Corinthian misleads
prospective students about the amount of federal aid for which they may be
eligible, including failing to disclose recent increases in Stafford loan eligibility.
Corinthian makes this misrepresentation at the expense of its students, who rely
on its misstatements and fail to secure the maximum federal grant money for
which they may be eligible.  Had they been properly advised about their eligibility
for federal financial aid, many students would have applied for more or would
have applied to other schools that were not at risk of violating the "90/10 Rule."

43.     Corinthian's failure to disclose to students Everest's violations of the
"90/10 Rule" constitutes another material omission on which students rely
because schools that violate this rule for two consecutive fiscal years lose all
eligibility for Title IV funding.  In other words, if Everest continues to violate the
rule, its students will lose the ability to even apply for federal student grant and
loan money to finance their Everest educations.  This risk greatly affects students
enrolled in a multi-year program with Everest because they are vulnerable to the
very real threat that their federal financial assistance will disappear, forcing a
choice between privately financing their educations and leaving school before
completing their degrees.  If students knew about this risk before enrolling, they
likely would not have enrolled in the first place.

44.     When students apply for federal financial aid, Corinthian further
misleads them by encouraging them to apply for federal student loans rather than
Pell Grants, a form of scholarship financial aid that students do not have to repay.
Corinthian is not concerned with the risks associated with federal student loans
because such loans are fully guaranteed by the federal government.

45.      Corinthian also misleads students about the risk of financing their Everest educations with federally subsidized loans.  Corinthian does not disclose the fact that Everest students default on their federal loans at rates at least three and a half times higher than the national average.  As Corinthian explained in its Q3 2010 Form 10-Q, the fiscal 2008 Cohort Default Rate – the percentage of students who default on their federal student loans – for nine of its institutions exceeded 25%.  The national average for the same year was only 7%.  Even more concerning is Corinthian's admission regarding 2009: "the draft cohort default rates for the 2009 Cohort will not be available until February 2011.  However, based on currently available information, we believe the number of our institutions which would exceed [the] 25% default rate threshold for the 2009 Cohort will be substantially higher than for the 2008 Cohort . . . ."

46.      One independent analysis has predicted that Corinthian's average company-wide Cohort Default Rate could be as high as 39%.  This means that nearly two out of every five Corinthian students would default on their student loans.

47.      This omission is critical because high student default rates are a leading indicator that graduates cannot repay their loans, either because their educations did not adequately prepare of quality them for employment; because their degrees only allow them to secure low-wage jobs; or because their schools' tuition rates exceed the schools' value in helping graduates to find employment.  Recognizing this, the Department of Education has proposed a "gainful employment" test to measure a school's ability to prepare its graduates to succeed in the marketplace that would directly link the school's student loan default rates to its ability to adequately prepare students for high-wage post-graduate employment.

48.      This omission is additionally material because schools whose Cohort Default Rates exceed 25% per year for three consecutive years, as appears to be

1   the case with Everest and Heald, risk losing their eligibility to receive Title IV

2   funding.  As does Everest's non-compliance with the "90/10 Rule," this risk

3   jeopardizes the continued federal financial assistance of students enrolled in

4   multi-year programs at Everest or Heald.  It goes without saying that if

5   prospective students knew that students at these schools defaulted on their loans

6   at such alarming rates, they would likely not have enrolled there in the first place.

7          49.      All of these misrepresentations and omissions pertaining to financial

8   air are harmful to students, who are misled into applying for loans they cannot

9   pay back and are not dischargeable through bankruptcy.  As a result, tens of

10   thousands of class members who have fallen prey to Corinthian's deceptive tactics

11   and later defaulted on their loans will continue to carry crippling debt and poor

12   credit ratings, potentially for life – even if they file for bankruptcy and attempt to

13   restore their financial health.  In a Congressional floor speech, Senator Durbin

14   explained the impact of Corinthian's inducement:

15          Do you know what happens when you default on a student
16          loan in America?  It is time we tell students what they get
             into if they get in over their heads with a worthless
17          education:

18          • Your loan will be turned over to a collection agency
19              and they may charge 25 percent more to collect what
                 you owe.
20

21          • Your wages can be garnished; that is, they can take it
                 right out of your paycheck.
22

23          • Your tax refunds can be intercepted by the Federal
                 Government if you still owe on a student loan.
24

25          • Your Social Security benefits ultimately will be
                 withheld if you end up in debt at that point in life
26              from a student loan.

27          • Your defaulted student loan will be reported to a credit
28              bureau and will remain on your credit history for 7

years, even after it is paid.  That means you may not be able to buy a car, a house or take out a credit card.  It might be you cannot get a job because of your credit history.  You cannot take out more student loans ore receive Pell grants to go back to school.

- You are no longer eligible for HUD or VA loans.

- You could be barred from the Armed Forces and might be denied some jobs in the Federal Government.

- I might also add, most student loans are not dischargeable in bankruptcy.  When the bottom falls out and you go to bankruptcy court, that is the one that will still be hanging over you when you walk out of that court process.

**Corinthian Misrepresents the Cost of Attending Everest and Heald.**

50.     While misleading students about their financial aid options and the financial aid process, Corinthian uniformly misrepresents to all potential students the true costs of attending Everest or Heald.  Specifically, Corinthian (1) quotes tuition rates for only portions of its degree programs; (2) fails to disclose hidden administrative fees associated with each program; and (3) entirely omits any cost-of-attendance information from its websites.

51.     In April 2010, the Department of Education exposed Corinthian's practices of misquoting tuition rates and hiding administrative fees from prospective students.  The Department of Education's report chastised Corinthian for systematically "fail[ing] to accurately inform students of the program costs" of its degree programs.  This failure included quoting to students the cost of attendance based on a nine-month enrollment period when, in fact, the enrollment period was twelve months; failing to disclose thousands of dollars in hidden administrative fees; and misrepresenting the amount of tuition that students could pay with federal student aid.

52.     In a report issued August 3, 2010, The Government Accountability Office likewise documented that Everest and Heald systematically misrepresent the cost of attending their programs.  Commenting on the findings, Senator Durbin explained that an investigator posing as a potential student "found that the admissions representative at Everest College misrepresented the cost and length of the program" in which the investigator sought to enroll.

53.     In addition to affirmatively misleading students through scripted misrepresentations, Corinthian uniformly omits from its websites any information about the costs of attending Everest or Heald.  This omission compels students to consult with an enrollment advisor – and consequently to rely on the scripted oral misrepresentations of those advisors – when making the decision to enroll.

54.     This deception harms Corinthian's students, who ultimately are induced into enrolling at one of the most expensive schools in the United States. While each Everest campus and online program sets its own tuition, according to Corinthian's 2010 Annual Report those rates ranged from $204 to $457 per credit hour for undergraduate programs and from $367 to $548 per credit hour for graduate programs.

55.     These tuition rates are among the highest in the country.  The United States Department of Veterans Affairs (the "VA") publishes an annual table showing the "*highest* in-state, undergraduate public tuition" rate for each state in the country.  As the most recently updated table shows, several states' **most expensive public colleges** charged far less per credit hour than the average cost of attending Everest.

56.     Corinthian's failure to properly disclose the costs of its institutions constitutes a violation of 34 C.F.R. § 668.43, which requires educational institutions receiving Title IV funds to make certain information readily available to enrolled and prospective students.  The information such institutions must make readily available includes tuition, fees, and other estimated costs; the

institution's refund policy; the requirements and procedures for withdrawing from the institution; a summary of the requirements for the return of Title IV grant or loan assistance funds; the institution's accreditation information; and the institution's completion or graduation rate.

57.     Federal and California law both require academic institutions to make this information readily available to prospective students *before* they enroll in any program.  Corinthian does not.

**Corinthian Misrepresents Everest's Accreditations.**

58.     In an effort to make its schools seem reputable and its degrees seem marketable, Corinthian misleads prospective students about Everest's accreditations.  Through written misrepresentations, uniform scripted oral misrepresentations, and material omissions, Corinthian misleads students about: (1) the type of accreditation its schools possess; (2) the value of these accreditations; and (3) its schools' non-compliance with established accreditation standards.

59.     On a webpage entitled "The Everest Advantage: Top 10 Reasons You Should Earn an Online Degree at Everest," Everest University Online lists as its number one reason, "Accreditation: Our accreditation sets us apart.  It's an accreditation that shows the strength of our academic programs and instruction."

60.     On a page entitled "How Our Accreditation Benefits You," Everest University Online's website goes on to explain:

> Accreditation is a distinction granted to any institution meeting or exceeding the stated criteria of educational quality. . . .
>
> We're proud of our accreditation because it sets us apart.  It's an accreditation that shows the strength of our academic programs and instruction.  Our accreditation means that our campus:

- Is recognized as a qualified institution of higher learning with approved programs of study that meet recognized academic standards.

- Employs a professional staff.

- Has sufficient facilities and equipment.

- Is a stable and permanent fixture in the educational community.

61.     These statements are false and misleading because they fail to disclose that all but one of Everest's schools has a national, not a regional, accreditation.  They further misrepresent the value of such an accreditation.

62.     There are two types of accreditation in the United States: regional and national.  Somewhat counterintuitively, regional accreditation is reputable and marketable, while a national accreditation is neither.  Virtually all traditional non-profit postsecondary institutions are regionally accredited, while a majority of for-profit and "online only" postsecondary institutions have only a national accreditation.  Schools with regional accreditation enjoy a favorable reputation within the academic community and with employers, evidenced by the facts that virtually no undergraduate schools will accept transfer credits from a nationally accredited school; virtually no graduate schools will recognize an undergraduate degree from a nationally accredited school as evidence of qualification for a graduate program; and a majority of employers in professional industries refuse to recognize degrees from nationally accredited universities.

63.     Everest's failure to disclose its national accreditation status renders the statements on its website false and misleading because its national accreditation does not in fact "set Everest apart" from other institutions, nor does it reflect "the strength of its academic programs" relative to other colleges and universities.

1    64.    These statements are also false and misleading because they fail to
2  disclose Corinthian's shady history of non-compliance with its accreditation
3  requirements.  The Higher Learning Commission ("HLC"), the accrediting
4  agency for Everest College Phoenix and Everest University Online, has repeatedly
5  warned Everest College Phoenix, one of the Everest campuses from which its
6  online program is administered and the only Everest campus to enjoy a regional
7  accreditation, that it has not complied with the standards required of an
8  accredited postsecondary institution.

9    65.    In 2008, the HLC conducted an on-site evaluation before placing
10 the school on probation on May 1, 2009 because it was "out of compliance with
11 one or more accrediting standards."  On August 19, 2010, the HLC conducted an
12 on-site "Comprehensive Evaluation Visit," after which it submitted a report that,
13 according to Corinthian's 10-Q, noted that "deficiencies in the institution's
14 compliance with HLC's accreditation criteria remained unresolved."

15   66.    Corinthian did not disclose any of the information in its Form 10-Q
16 filing to its students.  In reality, even Corinthian's Form 10-Q itself was
17 misleading because it did not disclose all the findings of the HLC report and all
18 the problems with its accreditation.

19   67.    On November 4, 2010, HLC issued an order to show cause to
20 Everest College Phoenix, stating that the school was not in compliance with
21 numerous significant accreditation standards and granting until March 21, 2011
22 for the school to achieve compliance.  Among other things, the HLC identified
23 non-compliance with the following standards:

24        (a)    whether the institution realistically prepares students for a
25    future shaped by multiple society and economic trends;

26        (b)    whether the institution's resource base supports its educational
27    programs and its plans for maintaining and strengthening their quality in
28    the future;

     (c)     whether the institution's ongoing evaluation and assessment processes provide reliable evidence of institutional effectiveness that clearly inform strategies for continuous improvement;

     (d)     whether all levels of planning align with the institution's mission, thereby enhancing its capacity to fulfill that mission;

     (e)     whether the institution values and supports effective teaching; and

     (f)     whether the institution's learning resources support student learning and effective teaching.

68.     The HLC's findings of non-compliance directly contradict the statements on Everest's websites that its accreditation "sets us apart," "shows the strength of our academic programs and instruction," and signals that its campus "has sufficient facilities and equipment." To the contrary, Everest's probationary status and the HLC's order to show cause demonstrate the exact opposite – that Everest's academic programs and instruction are ineffective and that Everest does not devote sufficient resources to its facilities and equipment.

69.     Indeed, the only thing that "sets [Everest] apart" is its probationary status and impending loss of accreditation.

**Corinthian Misrepresents The  Quality and Reputation Of Its Programs.**

70.     Corinthian also makes uniform written and scripted oral misrepresentations and omissions regarding the quality of its academic programs and the reputation these programs enjoy with potential employers.

71.     On a web page entitled "The Everest Advantage: Top 10 Reasons You Should Earn an Online Degree at Everest," after listing its accreditation Everest goes  on to boast of its "distinguished faculty" and "national recognition":

### 2. Distinguished Faculty

Everest instructors are skilled educators with strong academic backgrounds.  All instructors have either a Master's degree or

PhD along with years of professional work experience.  This unique combination of expertise provides our students with a rich learning experience.

### 3. National Recognition

Everest has campuses across the United States.  When you join an Everest online degree program, you're part of a national community of students.  Our family of Everest graduates and students are all over the country, which shows the strength of our growing community.

72.     These statements are false and misleading because they suggest that Everest's "distinguished faculty" and "national recognition" place it on equal footing with other colleges and universities.  They also falsely suggest that potential employers and academic institutions that recognized degrees from other accredited schools and universities will recognize degrees from Everest as valid.

73.     This is not the case.  Virtually no academic institution will accept Everest college credits for transfer students or accept an Everest undergraduate degree as proof of qualification for a graduate program.  Similarly, while recognizing degrees from regionally accredited schools as proof of qualification, many employers refuse to recognize identical degrees from nationally accredited institutions as proof that a prospective employee qualifies for a certain position.

74.     Most importantly, the statements on Everest's website suggest that its students will receive a high quality education from engaged and dedicated professors.  But as the HLC's order to show cause and decision to place Everest College Phoenix on probation demonstrate, Everest neither "values and supports effective teaching" nor does it ensure that its "learning resources support student learning and effective teaching."

75.     Corinthian also misrepresents on its websites the value and quality of an education at Heald.  Heald's website boasts:

Our education philosophy is simple: **We succeed when our students succeed.**

Unlike other career colleges, earning an associate degree at Heald is much more than just skill training.  Our education philosophy is to provide our students with the resources necessary to become well-rounded, highly motivated, qualified candidates for their career.  [sic]

. . . Our faculty consists of people who know what it means to be in the work force.  At Heald, we hire instructors who have both academic and real-world experience.  They teach practical, relevant skills that students will actually be able to use throughout their careers.

76.     These statements are false and misleading because Heald does not provide sufficient resources for its students, because many of its teachers are not qualified, and because a degree from Heald does not qualify graduates for careers in the marketplace.

77.     As do its various websites, Corinthian's enrollment advisors similarly make scripted oral misrepresentations about the quality and reputation of its schools while recruiting prospective students, describing Everest and Heald as great schools with amazing professors who offer individualized attention to their students.  These advisors uniformly claim that Everest's and Heald's degree programs are characterized by hands-on training, small work teams, and individualized instruction by experienced and qualified professors who can provide real world career placement advice.

78.     Corinthian's enrollment advisors continue to make false and misleading statements about the quality and value of a Corinthian education, and about students' job placement prospects, during the students' enrollment periods. In an effort to maintain a high retention rate, advisors reassure students that they are receiving a quality education at an affordable price and that they should continue pursuing their degrees to completion.

79.     These statements are false and misleading because the quality of instruction at Everest and Heald is uniformly subpar, the instructors are far less

qualified than are professors from reputable colleges, and any career placement advice the schools offer is useless given that most employers refuse to even recognize the validity of the degrees Corinthian awards.

80.    These misrepresentations are additionally misleading because Corinthian couples them with the omission of certain material facts, such as that degrees from Everest or Heald are not as marketable as similar degrees from traditional postsecondary schools and that degrees from Everest or Heald will only be of *de minimis* value to graduates seeking employment in their chosen professions.

**Corinthian Misrepresents Students' Post-Graduation Employment Prospects And Its Career Placement Services.**

81.    Corinthian's deception does not stop at the cost and quality of its educational programs, but extends further with misrepresentations and material omissions regarding its students' post-graduate employment opportunities and its ability and willingness to help its graduates find employment.

82.    On its various websites pertaining to the claimed merits of its degree programs, Everest boasts the following:

**We Jumpstart Your Job Search.**

Whenever you need help finding a job, or want some advice on improving your resume or interviewing skills, our Career Services Department is ready to assist you. . . .

**Career Search**

At Everest, our commitment to your success extends beyond graduation.  Our Career Services experts offer job-placement assistance to every student and graduate.  As you start your job hunt, we'll help you with job leads and job search Web sites, valuable industry and company information, helpful networking tips, links to professional associations' web sites, and more.

83.     Everest's enrollment advisors also make scripted oral misrepresentations to prospective students that Everest's career placement personnel will work diligently to jump start their careers after graduation and that Everest's job placement rate is well over 90%.

84.     Heald also boasts of its career placement services on a webpage entitled "Career Assistance for Life":

**Career services assistance for life**

At Heald, we not only help you find a job after you graduate, we help you find a job any time you need one, throughout your career.

**Career services assistance when you graduate**

Heald's job placement assistance is intended to help you make the transition from college to the workplace as quickly and easily as possible.  As a Heald student, you'll work with a career services advisor who will help you look for full-time or part-time work in your field of study.  We'll give you the tools necessary to present yourself professionally, so you can start a rewarding career when you graduate.

**Career services assistance whenever you need it**

At Heald, we're committed to providing career services assistance to our graduates, for life.  From graduation to retirement, we'll help you advance your career whenever you need it.  And, since we've been around for over 145 years, you can count on us to be here when you need it most.

85.     Everest's and Heald's claims are false and misleading because they suggest that they provide their graduates with substantial job placement assistance and prospects for high-wage employment in their chosen professions upon completion of their degrees.  The facts demonstrate that Corinthian does little, if anything, to prepare students for successful careers, and that the degrees its institutions award are of only *de minimis* value in the marketplace.

86.     As already outlined, all but one of Everest's campuses have only national accreditations, which are virtually worthless because prospective employers place little value on degrees from nationally accredited schools. The HLC's order to show cause, which states that Everest fails to "realistically prepare [students] for a future career shaped by multiple societal and economic trends," captures just how little value an education from Everest provides for its students.

87.     Corinthian's high student loan default rates further confirm the worthlessness of the degrees Everest and Heald bestow on students seeking to obtain employment after graduation.

88.     Aware of the systematic practice among for-profit colleges of charging above-market tuition rates and encouraging students to take out loans to finance practically valueless degrees, the Department of Education recently proposed a new test to measure a school's performance in preparing students for employment. In its Q3 2010 Form 10-Q, Corinthian described the Department of Education's proposal "to adopt a definition of 'gainful employment' linked to a two-part test: measuring the relationship between the debt students incur and their incomes after completion; and measuring the rate at which all enrollees, regardless of completion, repay their loans."

89.     In other words, the Department of Education's proposal would measure a school's performance in preparing students for "gainful employment" by assessing whether the school's graduates are able to secure employment at wages high enough to repay the loans they incurred to finance their educations. Where a high number of graduates face student debt that is excessive relative to their incomes, or where a high percentage of graduates are unable to repay their student loans, the proposed test would indicate the school in question is failing to adequately prepare its students for post-graduation job placement.

90.     Keenly aware that such a metric would expose its own dismal performance at preparing students for employment, Corinthian expressed its

Class Action Complaint (*Muñiz v. Corinthian Colleges, Inc., et al.*)

concern about the Department of Education's proposal in its Form 10-Q report: "[this provision] could affect the manner in which we conduct our business, and compliance with the gainful employment rules could have a material adverse effect on our business, financial condition, results of operations and cash flows." Since Corinthian's students default on their federal student loans at a rate at least three and a half times above the national average, the company's fears that it could be held accountable for its graduates' poor employment prospects are well-founded.

91.     Not surprisingly, Corinthian has embarked on a multi-million dollar lobbying and marketing campaign specifically aimed at defeating the Department of Education's proposed "gainful employment" test. Senator Durbin highlighted Corinthian's lobbying efforts in his September 28, 2010 Congressional floor speech:

> We think these schools would either have to improve the salary outcomes of their students or cut tuition costs. Either way, that is good for students. But the for-profit colleges want us to believe that the idea of controlling student debt somehow hurts these students. Look at Corinthian College spending millions of dollars on these ads to stop this accountability. This company is buying full-page print advertising all across America.

92.     Corinthian's failure to prepare students for employment also derives not only from its lack of meaningful accreditation and the low-quality education it bestows, but also from the fact that the career placement services staffs at Everest and Heald do not provide actual assistance to students and graduates in their job searches. Corinthian's career services employees do not provide the individualized support or training they promise students and graduates, nor do they offer guidance in the areas Everest and Heald describe on their webpages.

93.     Plaintiff's own experience is illustrative. Plaintiff was induced to enroll at Heald with the promises that its degree program would prepare her for

1  post-graduate employment and that Heald's career placement services personnel
2  would work to help place her in a high-skill, high-wage earning job.

3      94.      Relying on these misrepresentations, Plaintiff enrolled in and
4  completed Heald's business skills program.  Heald provided Plaintiff with no
5  placement assistance.  After she was unable to get a job with her business skills
6  program certificate from Heald, Plaintiff enrolled in the school's paralegal and
7  criminal justice programs.

8      95.      While taking a quarter off from her criminal justice studies for
9  financial reasons and after informing Heald's financial aid office that she would
10  be returning as a full-time student the following quarter, Plaintiff attempted to
11  use the computers at her Heald campus to search for a job.  Conrad Woodall, the
12  director of the criminal justice program, approached Plaintiff and told her she was
13  not permitted to use the computers before forcing her to leave the campus.
14  When Plaintiff returned the following day to continue her job search, she was
15  told she could no longer have access to the school's computers for that purpose.

16      96.      Only after Plaintiff complained about the treatment she received
17  from Mr. Woodall and Dick González, the school's academic affairs director, did
18  Heald acknowledge that, as a graduate of Heald, Plaintiff was entitled to use the
19  school's equipment to search for a job.  In other words, not only did Heald not
20  provide Plaintiff with the job placement assistance it promised, its officials
21  actively **violated the school's own policies** and impeded Plaintiff's attempt to
22  conduct a job search through her own effort.

23      97.      Plaintiff's experience exemplifies Senator Durbin's warning that
24  schools like Corinthian promise "courses, training, and degrees that will lead to a
25  good job and, in fact, it leads to a dead end, where they end up with a worthless
26  piece of paper."
27  /////
28  /////

**Corinthian Targets Active Military Personnel and Veterans for Deception.**

98.     In an even more shocking ploy to maintain its Title IV standing while feeding as heavily as it can from the government trough, Corinthian specifically targets veterans and active military personnel for enrollment.

99.     Corinthian's motivation for this is simple.  To maintain its Title IV standing, Corinthian must derive at least 10% of its revenues from sources other than Title IV funds and certain other designated federal programs.  Payment received from veterans and active military personnel under the Post-9/11 GI Bill does not count towards this 10% limit, allowing Corinthian to collect unlimited federal money via the Post-9/11 GI Bill while still maintaining its Title IV standing for the purposes of federal financial aid.

100.     Based on a Congressional report issued the same day, Bloomberg News published an article on December 9, 2010 reporting that twenty for-profit colleges, including Corinthian, "reaped $521 million in U.S. taxpayer funds in 2010, seven times more than in 2006, by recruiting armed-service members and veterans through misleading marketing."  That article went on to explain Corinthian's motivation:

> Getting the money from military personnel helped the companies circumvent a cap on the aid they can receive from the Education Department, their main source of income . . . .
>
> The Post-9/11 GI Bill, which Congress passed in 2008, raised educational benefits for almost all military veterans, and in some cases allowed them to pass money for school to spouses and children, according to the report.  The colleges made it a priority to recruit military members to exploit the surge in benefits . . . .
>
> A 1992 law allows for-profit colleges to get as much as 90 percent of their revenue from federal financial aid.  The companies seek military students and veterans because their education benefits are counted as a non-government source, according to the Harkin report.

101.     As Iowa Senator Tom Harkin explained, this backdoor channel has "unintentionally subjected this new generation of veterans to the worst excesses of the for-profit industry: manipulative and misleading marketing campaigns, educational programs far more expensive than comparable public or non-profit programs, and a lack of needed services."

102.     In addition to the same misrepresentations and material omissions it uses to lure other prospective students into its academic institutions, Corinthian engages in a number of deceptive practices aimed directly at active military personnel and veterans.

103.     For example, Everest's enrollment website includes a page entitled "Military Spouse Education," which describes its program for enrolling the spouses of active duty military personnel.  Military dependants are eligible for tuition assistance under the Post-9/11 GI Bill and, on this page, Everest boasts that its online college will provide "a scholarship for active duty personnel and their dependent spouse[s] and children.  Scholarship awards are 15% of tuition."

104.     Nowhere on its enrollment site, however, does Everest specify the actual cost of attendance, which is among the highest in the country.  The United States Department of Veterans Affairs, "in accordance with [its] statutory requirement to determine the highest in-state undergraduate, public tuition," publishes a table each year showing the state-by-state maximum dollar amount of tuition and fees that the Post-9/11 GI Bill and other veteran education assistance programs will cover.  According to the most recent version of this table, published in August 30, 2010, Everest's per credit hourly tuition rates are **higher than** even the **most expensive public colleges** in several states.

105.     This fact is particularly significant for military personnel and veterans in those states choosing between various higher education options. Because the Post-9/11 GI Bill will only pay for tuition costs up to the maximum charge per credit hour of the most expensive in-state public college, for many

active military personnel and veterans the bill is not sufficient to cover the high costs of attending Corinthian's schools.

106. The result is that Corinthian encourages military personnel and veterans who should never have required loans to finance their postsecondary educations into applying for loans to cover their tuition and fees at a Corinthian institution. In the end, military personnel and veterans falling victim to this scheme end up defaulting on their loans at rates significantly higher than do veterans at comparable public or not-for-profit schools. Had these military personnel and veterans not been misled into attending one of Corinthian's expensive and low-quality institutions, many would have never attended Everest or Heald and never would have taken out a loan, instead graduating debt-free from a reputable college with a marketable degree.

107. The data bear this out, revealing that members of the military and veterans who have been misled into enrolling in programs like those Corinthian offers have dropped out and defaulted on loans at an alarmingly high rate. As Bloomberg reported in its December 9, 2010 article:

> Statistics suggest that the for-profit colleges attended by military members have high dropout rates and poor educational results . . . . At 4 of the 5 for-profit colleges receiving the most in Post-9/11 GI Bill funding, loan repayment rates were below 37 percent . . . .

> At the same 4 schools, 24 percent of the students defaulted on their loans . . . . The national rate of student default on government loans was 7 percent in the academic year ended in 2008, the most recent period for which data are available, according to the Education Department.

**The Government Accountability Office Exposes Corinthian's Misfeasance.**

108. Alarmed by several trends in the for-profit education industry, the United States government in 2009 instructed its Government Accountability

1  Office ("GAO") to investigate the practices of for-profit academic entities like
2  Corinthian.  Among the trends prompting this investigation were:

3        (a)  *Exploding Enrollment.*  Enrollment in for-profit colleges and
4  universities has grown far faster over the last decade than has enrollment at
5  traditional higher education institutions.  From about 365,000 in 2004,
6  enrollment in for-profit colleges grew by almost 400% to approximately 1.8
7  million students in 2009.

8        (b)  *Magnitude of the For-Profit Educational Industry.*  The fourteen
9  largest for-profit educational corporations in the United States, which
10  includes Corinthian, are worth an estimated $26 billion as of July 2010.

11        (c)  *Disproportionate Federal Financial Assistance.*  In 2009, students
12  at for-profit colleges received more than $4 billion in federal Pell Grants
13  and more than $20 billion in federal financial aid provided by the
14  Department of Education.  Although for-profit college students constitute
15  only about 9% of all college students in the United States, these totals
16  represent approximately 25% of the total Pell Grants and federal financial
17  aid awarded to college students throughout the country.

18        (d)  *High Student Loan Default Rates.*  Because the federal
19  government guarantees educational loans, the government and the
20  American taxpayer must pick up the tab when a student defaults.  In 2009,
21  despite representing only 9% of the national student population, students at
22  for-profit colleges and universities were responsible for 44% of the student
23  loan defaults in the country.

24      109.    In its report dated August 3, 2010, the GAO concluded that the for-
25  profit educational institutions it investigated had systematically recruited students
26  through deceptive marketing, harassing recruitment tactics, and illegal employee
27  incentive programs in order to increase student enrollment and drive up company
28  profits.  The GAO's investigation also revealed that many of these schools

1  violated federal law by paying bonuses to enrollment advisors based directly on
2  the number of students they enrolled or retained.

3      110.    The GAO further found that every one of the institutions it
4  investigated made deceptive and misleading statements regarding federal financial
5  aid in order to secure students' financial aid applications for the maximum
6  amount allowable under federal guidelines.  The GAO confirmed that these
7  entities also misrepresent to prospective students, among other things, the true
8  costs of attending their schools, the students' ability to receive and obligation to
9  repay federal tuition assistance, and their students' post-graduation employability
10  and salary potential.

11      111.    The GAO's report also shed light on the practice of targeting active
12  military personnel and veterans by offering misleading military benefits plans.
13  For example, several schools recruited students eligible for tuition assistance
14  under the Post-9/11 GI Bill by claiming to offer military discounts on tuition
15  when, in reality, those same schools were charging tuition rates higher than what
16  the Post-9/11 GI Bill and other veterans' tuition assistance programs would
17  cover.

18      112.    Corinthian confirmed in its Form 10-K of August 2010 that Everest
19  was one of the for-profit institutions probed by the GAO's investigation: "We
20  believe that two of our campuses, one of which was Everest College Phoenix,
21  were among those visited by the GAO.  At the HELP Committee hearing on
22  August 4, 2010, the GAO provided testimony that characterized the interactions
23  between our campus personnel and the GAO investigators as 'deceptive or
24  otherwise questionable.'"

25                    **Equitable Tolling Allegations**

26      113.    At all relevant times, while inducing class members to enroll at
27  Everest or Health through misleading misrepresentations and under false
28  pretenses, the defendants fraudulently concealed relevant facts that would have

1  allowed Plaintiff and the class to discover the conduct described in this complaint.

2  The defendants continued to make reassuring misrepresentations to class

3  members after their enrollment in an effort to retain their enrollment in the

4  defendants' degree programs under false pretenses for as long as possible.

5      114.     As a result of the defendants' fraudulent concealment, the statute of

6  limitations, as it applies to the claims of Plaintiff and the class, should be tolled.

7  The application of any statute of limitations that might otherwise bar any of the

8  claims at issue should be tolled because the defendants actively misled the class

9  with respect to: the true cost of attending Corinthian's institutions; the quality of

10  the academic instruction Corinthian's institutions would provide; class members'

11  post-graduation job prospects, employability, and earning potential; Everest and

12  Heald's career placement services; federal student loan repayment options and

13  obligations; and Corinthian's students' federal loan repayment rate.

14      115.     Plaintiff exercised due diligence in discovering the defendants'

15  wrongdoing and by promptly filing this complaint after making such discovery.

16  This wrongdoing was not discoverable before the filing of this action because the

17  defendants concealed their wrongdoing.  The defendants have never publicly

18  disclosed their wrongdoing in making the uniform, class-wide written and oral

19  misrepresentations and material omissions described in this complaint.

20                                **Fraud**

21                            **(First Claim)**

22      116.     Plaintiff realleges and incorporates all of the preceding paragraphs.

23      117.     As part and parcel of their recruiting scheme, the defendants

24  engaged in a pattern and practice of knowingly and intentionally making false

25  representations of material facts, and material omissions, with the intent to

26  deceive or induce Plaintiff and members of the class to rely on those false

27  representations and omissions.

28

118.    Through their marketing materials and their employees, including but not limited to enrollment advisors and financial aid officers, the defendants induced Plaintiff and class members to enroll in classes at Everest by making one or more fraudulent misrepresentations.

119.    For example, the defendants misrepresented that Everest's schools have valuable accreditations: "We're proud of our accreditation because it sets us apart.  It's an accreditation that shows the strength of our academic programs and instruction."

120.    Everest's schools do not have valuable accreditations that "set them apart" from other academic institutions.  All but one of Everest's schools have only a national accreditation, from the Higher Learning Commission, which is far less respected and marketable than the regional accreditations the vast majority of colleges and universities in the United States possess.  This lack of any but a national accreditation virtually ensures that Everest students will be unable to transfer credits from Everest to other academic institutions, to enroll in graduate programs at other academic institutions, or to find meaningful wage-earning employment in their chosen professions.

121.    Everest has also been on probation from its accrediting agency since May 2009 for failing to meet the basic standards required of accreditation, including a failure to provide sufficient resources and offer support for "effective teaching."

122.    While deceiving students through its website and through uniform scripted oral representations about the value of Everest's accreditation, the defendants fraudulently concealed the fact that Everest's accrediting agency has found that the school neither "realistically prepares [students] for a future shaped by multiple societal and economic trends," "values and supports effective teaching," nor offers "learning resources [that] support student learning and effective teaching."

123.     The defendants also misrepresented the job services Everest provides for its students: "We jumpstart your job search.  Whenever you need help finding a job, or want some advice on improving your resume or interviewing skills, our Career Services Department is ready to assist you."

124.     In reality, Everest's Career Services Department did not provide students with any of the job training or career placement services it promised to provide.  Everest did not and does not give students and graduates legitimate job placement leads, advice on resume-building or interview techniques, or any other career placement advice.

125.     The defendants knew that their misrepresentations were false when they made them, but made them nonetheless with the intent of inducing Plaintiff and class members to rely on them and enroll at one of Corinthian's academic institutions.

126.     As educators, the defendants occupied a fiduciary position and owed the class members heightened duties to act in good faith and with full candor and honesty.  The defendants breached their fiduciary duties by omitting material facts from their representations to class members, including:

(a)     that Everest and Heald charge among the highest tuition rates and fees in the country;

(b)     that federal student loan debt is not dischargeable through bankruptcy;

(c)     that degrees from Everest and Heald are not nearly as marketable as are similar degrees from traditional postsecondary schools;

(d)     that degrees from Everest and Heald have only *de minimis* value in helping graduates seek employment in their chosen professions;

(e)     that Everest has been and continues to be on accreditation probation for failure to meet basic accrediting standards;

1           (f)     that a majority of Corinthian's campuses risk losing all

2 eligibility for Title IV federal funding because of repeated violations;

3           (g)     that students of Corinthian's institutions default on their

4 student loans at rates up to six times the national average; and

5           (h)     that military personnel and veterans drop out and default on

6 student loans at a much higher rate at Corinthian's schools than they do at

7 traditional non-profit colleges.

8      127.     At the time the defendants made these misrepresentations and

9 omissions, Plaintiff and the members of the class were ignorant of the true facts

10 and justifiably relied on the defendants' misrepresentations and omissions in

11 deciding to enroll at Everest or Heald.

12      128.     As a result of the defendants' fraud, Plaintiff and each member of the

13 Class have suffered damages.

14      129.     The defendants made their fraudulent misrepresentations and

15 omissions knowingly, willfully, intentionally, maliciously, oppressively, and

16 fraudulently, with the purpose and intention of defrauding Plaintiff and the class

17 to the defendants' financial benefit.  This Court is empowered to, and should,

18 impose punitive damages sufficient to set an example of the defendants.

19                                  **Negligent Misrepresentation**

20                                       **(Second Claim)**

21      130.     Plaintiff realleges and incorporates all of the preceding paragraphs.

22      131.     As set forth in this complaint, the defendants made uniform and

23 systematic representations to Plaintiff and the members of the class.  As also set

24 forth in this complaint, the defendants did not disclose materials facts to Plaintiff

25 and the members of the class.

26      132.     At the time the defendants' made these misrepresentations and

27 omissions, they had no reasonable grounds for believing they were true.  The

28 defendants nonetheless made these material misprestations and omissions in

1 order to induce class members to rely on them, or with the reasonable expectation

2 that class members would rely on them, by enrolling at Everest or Heald.

3      133.    At the time the defendants' made these misrepresentations and

4 omissions, Plaintiff and the members of the class were ignorant of the true facts

5 and justifiably relied on the defendants' misrepresentations and omissions in

6 deciding to enroll at Everest or Heald.

7      134.    As a result of the defendants' fraud, Plaintiff and each member of the

8 Class have suffered damages.

9 **Violation of California Business & Professions Code § 17200, *et seq.***

10 **(Third Claim)**

11      135.    Plaintiff realleges and incorporates all of the preceding paragraphs.

12      136.    The Unfair Trade Practices Act, California Business & Professions

13 Code § 17200, *et seq.*, defines unfair competition to include any "unfair" or

14 "unlawful" business act or practice, including "unfair, deceptive, untrue, or

15 misleading advertising."

16      137.    Under the Unfair Trade Practices Act, Plaintiff is entitled to enjoin

17 the defendants' wrongful practices, and to obtain restitution for moneys paid to

18 the defendants, because of the defendants' unlawful, unfair, or deceptive acts and

19 practices.

20      138.    The defendants have violated the Unfair Trade Practices Act

21 through fraud, by misrepresenting facts to the class, by violating the False

22 Advertising Act, by violating the Consumer Legal Remedies Act, through breach

23 of implied contract, through breach of the implied covenant of good faith and fair

24 dealing, and by violating Title IV of the Higher Education Act of 1965, 20

25 U.S.C. § 1070, *et seq.*

26      139.    By virtue of their deceptive, misleading, and unfair business

27 practices, the defendants also violated the Unfair Trade Practices Act through

28 violations of the Private Postsecondary Education Act of 2009, California

1   Education Code § 94800, *et seq.*  Under this act, private postsecondary education
2   institutions may not:

3           (a)    promise or guarantee employment, or otherwise overstate the
4   availability of jobs upon graduation, Cal. Educ. Code § 94897(b);

5           (b)    advertise concerning job availability, degree of skill, or length
6   of time required to learn a trade or skill unless the information is accurate
7   and not misleading, Cal. Educ. Code § 94897(c);

8           (c)    pay any consideration to induce a person to sign an enrollment
9   agreement for an educational program, Cal. Educ. Code § 94897(h);

10           (d)    compensate an employee involved in recruitment, enrollment,
11   admissions, student attendance, or sale of educational materials to students
12   on the basis of a commission, commission draw, bonus, quota, or other
13   similar method, Cal. Educ. Code § 94897(n); or

14           (e)    require a prospective student to provide personal contact
15   information in order to obtain, from the institution's web site, educational
16   program information that is required to be contained in the school catalog
17   or any information required pursuant to the consumer information
18   requirements of Title IV of the Higher Education Act of 1965 and any of
19   its amendments, Cal. Educ. Code § 94897(o).

20       140.    As a result of the defendants' violations of the Unfair Trade Practices
21   Act, Plaintiff and each member of the class have suffered damages.  This Court
22   has the authority to, and should, order restitution to all class members from
23   whom the defendants unfairly or unlawfully received money.

24       141.    The defendants' unlawful and unfair business practices present a
25   continuing threat to members of the class and the general public.  This Court has
26   the authority to, and should, preliminarily and permanently enjoin the
27   defendants' unlawful and unfair business practices.
28   /////

## Violation of California Business & Professions Code § 17500, *et seq.*
### (Fourth Claim)

142.   Plaintiff realleges and incorporates all of the preceding paragraphs.

143.   The False Advertising Act, California Business & Professions Code § 17500, *et seq.*, makes it unlawful to "make or disseminate or cause to be made or disseminated before the public [a statement] which is untrue or misleading, and which is know, or which by the exercise of reasonable care should be known, to be untrue or misleading" with the intent to "induce the public to enter into any obligation relating thereto." The Act covers statements made through "any advertising device," including "over the Internet."

144.   Under the False Advertising Act, Plaintiff is entitled to enjoin the defendants' wrongful practices, and to obtain restitution for moneys paid to the defendants, because of the defendants' unlawful, unfair, or deceptive acts and practices.

145.   The defendants have violated the False Advertising Act by making or disseminating false and misleading statements through their websites about the true cost of attending Corinthian's schools, those schools' accreditations, the quality of academic instruction those schools offer, the type and quality of career placement services those schools provide, students' post-graduation job prospects, and students' employability and earning potential.

146.   The defendants made these false and misleading statements with the intent of inducing the general public, including Plaintiff and class members, to enroll in their degree and certificate programs.

147.   Plaintiff and each member of the class relied on the defendants' false and misleading advertising in deciding to enroll at Everest or Heald.

148.   As a result of the defendants' violations of the False Advertising Act, Plaintiff and each member of the class have suffered damages. This Court has

1 the authority to, and should, order restitution to all class members from whom
2 the defendants unfairly or unlawfully received money.

3    149.    The defendants' unlawful and false and misleading advertising
4 presents a continuing threat to members of the class and the general public.  This
5 Court has the authority to, and should, preliminarily and permanently enjoin the
6 defendants' unlawful and false and misleading advertising.

7    ## Violation of the Consumer Legal Remedies Act
8    ### (Fifth Claim)

9    150.    Plaintiff realleges and incorporates all of the preceding paragraphs.

10    151.    The Consumer Legal Remedies Act, California Civil Code § 1750,
11 *et seq.*, prohibits unfair competition and unfair acts or practices that are intended
12 to result, or which do result, in the sale of goods and services.

13    152.    Under the Consumer Legal Remedies Act, Plaintiff is entitled to
14 enjoin the defendants' wrongful practices because those practices are unlawful,
15 unfair, or deceptive.

16    153.    The defendants violated the Consumer Legal Remedies Act by
17 misrepresenting to Plaintiff and the class the true cost of attendance at Everest
18 and Heald; the quality of the academic instruction at these schools; students'
19 post-graduation employability; the type and quality of career placement services
20 they offer to students; and students' federal financial assistance options.

21    154.    The defendants' unfair competition and unfair acts or practices
22 present a continuing threat to Plaintiff, class members, and members of the
23 general public, in that the defendants continue to deceive prospective students
24 into enrolling in academic programs at Everest and Heald.

25    155.    As a result of the defendants' violations of the Consumer Legal
26 Remedies Act, Plaintiff and each member of the Class have suffered damages.
27 This Court has the authority to, and should, preliminarily and permanently
28 enjoin the defendants' illegal and unfair business practices.

## Breach of Implied Contract

### (Sixth Claim)

156.    Plaintiff realleges and incorporates all of the preceding paragraphs.

157.    Through promises to perform, the defendants entered into implied contracts with Plaintiff and class members.  For example, the defendants misrepresented to Plaintiff and class members that they would:

        (a)    provide a high-quality education at an affordable cost;

        (b)    prepare students for successful job placement in their chosen professions;

        (c)    equip students to earn top salaries in their chosen professions; and

        (d)    assist students with their interview skills and job searches through career placement services during and after enrollement.

158.    In reliance on these misrepresentations, and as consideration for performance of the defendants' promises, Plaintiff and class members promised to enroll as students at Everest or Heald and paid the tuition and fees the defendants charged them to do so.

159.    Plaintiff and the members of the class complied with all of their obligations under the implied contracts.

160.    Plaintiff and the members of the class have been deprived of the benefits of their agreements with the defendants.

161.    The defendants breached their implied contracts with Plaintiff and class members by failing to deliver the services they promised.

162.    As a result of the defendants' breach of implied contract, Plaintiff and each member of the class have suffered damages.

/////

/////

/////

## Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Seventh Claim)

163.     Plaintiff realleges and incorporates all of the preceding paragraphs.

164.     In every contract, there is an implied covenant of good faith and fair dealing that requires each contracting party to refrain from injuring the rights of others to receive the benefits of the agreement.

165.     The defendants breached the implied covenant of good faith and fair dealing in their contracts with Plaintiff and class members by interfering with class members' ability receive the benefits the defendants promised.

166.     As a result of the defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and each member of the class have suffered damages.  Plaintiff seeks actual damages and an injunction ordering the defendants to comply with the obligations they assumed by their implied contracts with class members and to refrain from taking any action to interfere with class members' rights to receive their contractual benefits.

## Jury Demand

167.     Plaintiff demands a trial by jury on all triable issues.

## Prayer for Relief

Plaintiff, on behalf of herself and the class, prays for judgment against the defendants as follows:

   a.     a declaration that this action is a proper class action under Federal Rule of Civil Procedure 23 and an order directing that reasonable notice of this action be given to each member of the class;

   b.     a declaration that the defendants' conduct constitutes a breach of contract, a breach of the implied covenant of good faith and fair dealing, a violation of California Business & Professions Code § 17200, a violation of Title IV of the Higher Education Act

1    of 1965, a violation of the California Private Postsecondary

2    Education Act of 2009, a violation of the Consumer Legal

3    Remedies Act, negligent misrepresentation, and fraud;

4         c.    an injunction enjoining the defendants, preliminarily and

5    permanently, from continuing the unlawful conduct alleged in this

6    complaint;

7         d.    restitution to Plaintiff and each member of the class of all

8    sums the defendants unlawfully collected from them during the

9    class period;

10        e.    disgorgement of all profits the defendants obtained

11   through their unfair business practices;

12        f.    punitive damages against the defendants;

13        g.    the costs of this suit, including expert fees, and

14   reasonable attorneys' fees, as provided by law; and

15        h.    such other and further relief as the nature of this case

16   may require, or as this Court deems just, equitable, and proper.

17

18   DATED:   February 11, 2011            Chapin Fitzgerald Sullivan LLP

19

20

21                                    By: _____

22                                         Edward D. Chapin, Esq.
                                           Douglas J. Brown, Esq.
23                                         Attorneys for Plaintiff

24

25

26

27

28

AO 440 (Rev  12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| Sandra L. Muñiz, on behalf of herself and all others similarly situated, | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.    **SACV11-00259 CJC (MLGx)** |
| Corinthian Colleges, Inc.; et al. [SEE ATTACHMENT] | ) | |
| _Defendant_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  [SEE ATTACHMENT]

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Edward D. Chapin, Esq.
Douglas J. Brown, Esq.
CHAPIN FITZGERALD SULLIVAN LLP
550 West C Street, Suite 2000
San Diego, CA  92101
(619) 241-4810

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

FEB 1 1 2011

Date: _____

J. Barrera

_Signature of Clerk or Deputy Clerk_

1                                 **ATTACHMENT TO SUMMONS**

2

3    Sandra L. Muñiz, on behalf of herself and all others similarly situated,

4         Plaintiff,

5    vs.

6    Corinthian Colleges, Inc.; Corinthian Colleges, Inc., d/b/a Everest College; Corinthian

7    Colleges, Inc., d/b/a Everest University; Corinthian Colleges, Inc., d/b/a Everest Institute;

8    Corinthian Colleges, Inc., d/b/a Everest College of Business, Technology and Health Care;

9    Heald College, LLC; and Heald Capital, LLC,

10        Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

AO 72
(Rev. 8/82)

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself [ ])

SANDRA L. MUNIZ, on behalf of herself and all others similarly situated

**DEFENDANTS**

CORINTHIAN COLLEGES, INC.; ET AL.

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Edward D. Chapin, Esq.
Douglas J. Brown, Esq.
CHAPIN FITZGERALD SULLIVAN LLP
550 West C Street, Suite 200
San Diego, CA 92101
(619) 241-4810

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

[ ] 1 U.S. Government Plaintiff
[ ] 3 Federal Question (U.S. Government Not a Party)
[ ] 2 U.S. Government Defendant
[X] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business in this State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. ORIGIN** (Place an X in one box only.)

[X] 1 Original Proceeding [ ] 2 Removed from State Court [ ] 3 Remanded from Appellate Court [ ] 4 Reinstated or Reopened [ ] 5 Transferred from another district (specify): [ ] 6 Multi-District Litigation [ ] 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** [X] Yes [ ] No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** [X] Yes [ ] No

[X] **MONEY DEMANDED IN COMPLAINT: $** PROOF

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. SECTION 1332 (d)(2)(A)

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [X] 890 Other Statutory Actions
- [ ] 891 Agricultural Act
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Info. Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loan (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS — PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Fed. Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury-Med Malpractice
- [ ] 365 Personal Injury-Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus-Alien Detainee
- [ ] 465 Other Immigration Actions

**TORTS — PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 445 American with Disabilities - Employment
- [ ] 446 American with Disabilities - Other
- [ ] 440 Other Civil Rights

**PRISONER PETITIONS**
- [ ] 510 Motions to Vacate Sentence Habeas Corpus
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus/Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

**FORFEITURE/PENALTY**
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third Party 26 USC 7609

FOR OFFICE USE ONLY: Case Number: SACV11-00259 CJC (MLGx)

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

COPY



---

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

### SACV11- 259 CJC  (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=====================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.