UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

O

Consolidated Case Nos.
SACV 11-0127 DOC (AJWx)
✓Consolidated with SACV 11-0259 DOC (AJWx)

Date: October 6, 2011

Title: KEVIN FERGUSON v. CORINTHIAN COLLEGES, ET AL
SANDRA L. MUÑIZ v. CORINTHIAN COLLEGES, ET AL

PRESENT:
THE HONORABLE DAVID O. CARTER, JUDGE

Julie Barrera
Courtroom Clerk

Not Present
Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                     NONE PRESENT

PROCEEDING (IN CHAMBERS): ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO COMPEL INDIVIDUAL ARBITRATIONS

Before the Court are Defendants' Motions to Compel Individual Arbitration and to Dismiss or Stay Proceedings Pending Arbitration, in the consolidated cases *Kevin Ferguson, et al. v. Corinthian Colleges, et al.* (Doc. No. 38) and *Sandra L. Muniz, et al. v. Corinthian Colleges, et al.* (Doc. No. 21).[1] The Court finds this matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. After considering the moving, opposing, and replying papers, the Court hereby GRANTS IN PART AND DENIES IN PART both Motions.

---

[1] Defendants' Motions are nearly identical. Because the substantive issues are the same, and because Plaintiffs filed a single Opposition to the Motions, the Court considers the Motions together.

## I. Background

Plaintiff Kevin Ferguson ("Ferguson") brings his action (SACV 11-127) ("Ferguson action") on behalf of himself and two classes consisting of persons who enrolled in and/or attended class at one of Defendant Corinthian Colleges' ("Corinthian") academic institutions. The "Everest Class" consists of those who attended Everest College, Everest Institute, Everest University, Everest University Online, or Everest College of Business Technology and Healthcare (collectively, "Everest") from January 24, 2005 to present, and the "Heald Class" consists of those who attended Heald College, LLC ("Heald") from January 24, 2009 to present. On April 15, 2011, the Court consolidated the Ferguson action with Plaintiff Sandra Muñiz's ("Muñiz") action. Muñiz also brings her action on behalf of herself as well as an Everest Subclass and a Heald Subclass.

Plaintiffs allege that students enroll in Corinthian institutions believing they are receiving a quality education at an affordable price, when, in fact, they pay some of the highest tuition rates in the country, incur crippling student loans, and graduate with a degree that never qualifies nor prepares them for any job placement other than low-wage, low-skill employment. Based on these allegations, Plaintiffs bring the following claims against Defendants, Corinthian, Everest, Heald, and Heald Capital, LLC, (collectively, "Defendants"): (1) breach of implied contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of Cal. Bus. & Prof. Code § 17200; (4) violation of Cal. Bus. & Prof. Code § 17500; (5) violation of the Consumer Legal Remedies Act; (6) negligent misrepresentation; and (6) fraud.[2] Plaintiffs each seek restitution, punitive damages, disgorgement of profits, and a permanent injunction.

## II. Legal Standard

The Federal Arbitration Act ("FAA") provides that "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has recognized this provision reflects both a "liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepción*, 131 S. Ct. 1740, 1745 (2011) (internal citations and quotation marks omitted). Under the FAA, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (*citing Moses H. Cone Mem'l Hosp. v. Mercury Const.*, 460 U.S. 1, 24, 103 S. Ct. 927 (1983)). The scope of an arbitration agreement is governed by federal substantive law. *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994); *Simula, Inc. v.*

---

[2] These claims appear in a different order in the Muñiz complaint.

*Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).

The Supreme Court has cautioned that arbitration agreements must be placed on equal footing with other contracts, which are enforced according to their terms. *Concepción*, 131 S. Ct. at 1745. Similarly, like other contracts, arbitration agreements may be declared unenforceable upon any legal or equitable grounds that exist for revocation of contracts generally (*e.g.*, fraud, duress, unconscionability). *Id.*

"The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588 (2002) (alteration in original).

### III. Discussion

As an initial matter, Defendants submit evidence suggesting that under the relevant arbitration agreements, the parties agreed that the arbitrator to whom the case is submitted "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." (Reply at 5-6 n.4 (*citing* Rule R-7(a) of the AAA Commercial Rules, applicable by agreement of the parties).) Plaintiffs do not address this point in their sur-reply. While the Court sees no basis to question the applicability of these rules since they are adopted by the relevant agreements, because Defendants raise this argument for the first time in reply, the Court will determine whether Plaintiffs' claims are subject to arbitration.

#### A. Validity of Agreement

Defendants argue they have carried their burden to demonstrate the arbitration agreements entered by each Plaintiff with Defendants are valid, and Plaintiffs have not carried their burden to demonstrate a defense to the enforcement of the relevant agreements. (Motions at 6.)

Plaintiffs do not argue the agreements are invalid or unenforceable by raising any contractual defenses such as fraud, duress, or unconscionability. Therefore, the Court presumes the agreements are valid.

#### B. Applicability of Agreements to Disputes

##### 1. Relevant Provisions

Plaintiff Ferguson's enrollment agreement contains the following Acknowledgment of

Waiver of Jury Trial and Availability of AAA Rules:[3]

> By my signature, I acknowledge that I understand that both I and The School are irrevocably waiving rights to a trial by jury, and are selecting instead to submit *any and all claims* to the decision of an arbitrator instead of a court. I understand that the award of the arbitrator will be binding, and not merely advisory. I also acknowledge that I may at any time, before or after my admission, obtain a copy of the Rules of the American Arbitration Association at no cost, from The School President.

Rhoten Decl., Ex. A at 7 (emphasis added).

In addition, the Enrollment Agreement Addendum & Disclosures signed by Plaintiff Ferguson contain the following Agreement to Binding Arbitration and Waiver of Jury Trial:

> I agree that any dispute *arising from my enrollment*, no matter how described, pleaded or styled, shall be resolved by binding arbitration under the Federal Arbitration Act conducted by the American Arbitration Association ("AAA") under its Consumer Rules.
>
> Terms of Arbitration
>
> 1. Both I and the School irrevocably agree that *any dispute between us* shall be submitted to Arbitration.
>
> . . .
>
> 4. I agree not to combine or consolidate any Claims with those of other students, such as in a class or mass action.

Rhoten Decl., Ex. B at 15-16 (emphasis added).

Plaintiff Muñiz's enrollment agreements contain the following relevant provisions:

---

[3] This Acknowledgment appears again in the Enrollment Agreement Addendum & Disclosures. Rhoten Decl., Ex. B at 16.

> Any dispute *arising from enrollment* at Heald College, no matter how described, pleaded or styled, shall be resolved by binding arbitration by a single, neutral arbitrator under the Federal Arbitration Act conducted by the American Arbitration Association ("AAA") at Davis, CA (student's city, state) under its Commercial Rules. . . . I acknowledge that I understand that both Heald College and I are waiving our rights to a trial by jury.

Adams Decl., Ex. A at 2 (emphasis added).

Plaintiff Muñiz also signed an Agreement to Binding Arbitration and Waiver of Jury Trial that reiterates the above language, and states that, "Both Student and the College irrevocably agree that *any dispute between them* shall be submitted to Arbitration." *Id.*, Ex. B at 1 (emphasis added). It also contains the Acknowledgment of Waiver of Jury Trial and Availability of AAA Rules found in Plaintiff Ferguson's enrollment agreement.[4] *Id.*

### 2. Asserted Claims

Plaintiffs bring their claims on behalf of themselves and other similarly situated, with the putative class defined as persons who "enrolled in or attended classes" offered by Defendants. (Compl. ¶ 20.)[5] Plaintiffs allege that Defendants use fraudulent misrepresentations to entice prospective students to enroll. (*Id.* ¶ 31.) Specifically, through Defendants' various websites, Plaintiffs claim they are deceived about federal financial aid, the true cost of attending Defendants' programs, the value of Defendants' accreditations, and the employment prospects and career placement services Plaintiffs can expect. (*Id.* ¶ 32.)

Defendants use enrollment advisors to aggressively recruit students. (*Id.* ¶ 33.) Defendants "enrollment advisors dispense false and misleading information to secure enrollments." (*Id.*) "These practices drive [Defendants'] enrollment practices . . . ." (*Id.* ¶ 34.) The enrollment advisors "pressure prospective students to enroll in a degree program before completing their applications for federally funded student loans. This allows [Defendants] to demand repayment immediately upon enrollment and prevents students from being able to defer payment until after

---

[4] Plaintiff Muñiz signed enrollment agreements for each of the different programs in which she enrolled. Those documents contain language identical to the provisions regarding "any dispute" cited above. Gerard Decl., Ex. A at 2; Ex. B at 2; Ex. C at 2.

[5] As Plaintiffs do in opposition, because the Ferguson and Muñiz complaints make substantially the same allegations, (Opp'n at 2 n.2), the Court cites only to the Muñiz complaint.

graduation." (*Id.* ¶ 36.) The enrollment advisors continue to make false and misleading statements about the quality of education and Plaintiffs' job prospects while the students are enrolled. (*Id.* ¶ 78.) The career placement offices do not help students and graduates in their job search. (*Id.* ¶¶ 92, 94, 124.)

Currently enrolled students face the risk of not being able to apply for future federal student loans if Defendants lose eligibility for Title IV funding based on their improper enrollment and lending practices. (*Id.* ¶ 43.) If Plaintiffs knew that students attending Defendants' institutions defaulted on their student loans at alarming rates, they would not have enrolled in the first place. (*Id.* ¶ 48.)

In addition to fraudulent financial aid practices, Plaintiffs allege that Defendants misrepresent the total cost of attending their institutions. (*Id.* ¶¶ 51-53.) Students are harmed by this because they end up paying some of the highest tuition rates in the country. (*Id.* ¶¶ 54-55.) Plaintiffs allege further misrepresentations about Defendants' accreditations and quality of programs, as well as misleading tactics used to recruit veterans.

### 3. Scope of Agreement

Defendants argue that because Plaintiffs' purported claims fall squarely within the relevant arbitration agreements, each Plaintiff's case must be compelled to individual arbitration. (Muñiz Mot. at 6-7; Ferguson Mot. at 7-8.) Specifically, Defendants argue that Plaintiffs' individual claims, alleging that enrollment was in violation of California law, fall within the scope of the agreements, which cover "any dispute arising from [my] enrollment. . . ." (*Id.*)

Plaintiffs agree that the arbitration agreements cover any dispute "arising" from enrollment. (Opp'n at 2.) However, Plaintiffs point out that all of their claims center around Defendants' deceptive marketing practices and representations made to prospective students in order to induce their enrollment. (*Id.* at 6-7.) Because this marketing scheme was executed well *before* Plaintiffs signed their enrollment agreements, the dispute cannot be said to "arise" from enrollment. (Opp'n at 2.) Thus, Plaintiffs conclude that Defendants' reading of the arbitration agreements, to include claims preceding enrollment, exceeds the scope of the agreements. (*Id.*)

The Court begins its analysis by acknowledging the "liberal federal policy favoring arbitration." *Concepción*, 131 S. Ct. at 1745. Pursuant to this policy, any doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration *Chiron Corp.*, 207 F.3d at 1130; *French v. Merrill Lynch*, 784 F.2d 902, 908 (9th Cir. 1986) (if the "purported agreement . . . is susceptible of an interpretation" that would allow arbitration, "any doubts . . . should be resolved in favor of arbitration").

Reading the enrollment agreements in their entirety, the Court finds that the language

bringing "any and all claims," "any dispute," "any dispute between us," and "any dispute between [the student and the School]" under the purview of the agreements to arbitrate, is sufficiently broad to encompass the claims asserted in Plaintiffs' complaints.[6] The Supreme Court has held that to require arbitration, a plaintiff's factual allegations need only "touch matters" covered by the contract containing the arbitration clause, with all doubts resolved in favor of arbitrability. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999) (*citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13, 105 S. Ct. 3346 (1985)). Here, Plaintiffs' claims can easily be found to touch upon matters covered by the enrollment agreement because the allegations pertain to all aspects of Plaintiffs' relationship with Defendants, including recruitment, enrollment, and graduation. The clear language of the enrollment agreements governs - any dispute between Plaintiffs and Defendants is to be submitted to arbitration. *See Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1106 (C.D. Cal. 2002) (finding scope of arbitration agreement to be sufficiently broad to cover asserted claims based on language extending to "any Claim either of us asserts").

Plaintiffs' argument that their claims fall outside the scope of the agreements because the claims arise *before* enrollment is unavailing. While some of the claims, such as fraudulent inducement, rely, in part, on factual allegations occurring before Plaintiffs signed the agreements, paid tuition, or attended their first class, the claims involve more than just the interaction Plaintiffs had with Defendants prior to their formal enrollment. Plaintiffs' allegations make clear that the act of enrollment, not only what occurred earlier, is central to their claims. For example, as cited extensively above, enrollment advisors pressure students to enroll and direct that financial aid paperwork be completed so loans come due immediately. In addition, the enrolment advisors continue to make false statements about financial aid and career prospects after students are enrolled. In order to claim an injury from these practices, students must have enrolled at one of Defendants' institutions. This point is implicitly admitted by Plaintiffs who define their putative classes as encompassing only those individuals who enrolled or attended a class with Defendants.

### 4. Broad or Narrow Construction

In order to escape this result, Plaintiffs argue that arbitration clauses are "narrow," which means arbitration should be compelled only to disputes "relating to the interpretation and performance of the contract itself." (Opp'n at 9 (*quoting Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d

---

[6] Plaintiffs' attempts to limit the scope of the agreements by asking the Court not to read them in their entirety is unavailing. (Sur-Reply at 1-3.) None of the phrases cited by the Court enlarge the scope of the agreements. Rather, the plain language of the agreements read in their entirety demonstrates the broad scope agreed to by the parties. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1976), cited by Plaintiffs, recognizes this principal: "the meaning of words contained in a contract is to be determined not from a consideration of the words alone but from a reading of the entire contract."

1292, 1295 (9th Cir. 1994).) Plaintiffs further contend that an arbitration clause using narrow "arising out of" language "covers only *contractual* disputes, where a clause covering disputes 'arising from or relating to' the agreement would also cover related tort claims." (Opp'n at 9.)

In reply, Defendants contend that the authority cited by Plaintiffs has been discredited by nearly every circuit, and has been distinguished by the Ninth Circuit. (Reply at 4.) Defendants argue that the Court should not read the "arising from" language in the agreements in isolation from the rest of the agreements, including their applicability to "any dispute" and "any and all claims" between the parties. (*Id.* at 4, 7.)

In *Tracer Research*, the Ninth Circuit found that "arising out of language" in an arbitration agreement is limited in scope such that it requires arbitration only of those claims relating to interpretation of the contract at issue, *i.e.*, the contract containing the arbitration clause. 42 F.3d at 1295. In reaching this conclusion, the court relied on its earlier decision, *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458 (9th Cir. 1983), which held that "arising under" language did not require disputes "relating to" an agreement to go to arbitration.

Recently, the Ninth Circuit confirmed that when an arbitration agreement uses the same "arising under" the agreement language discussed in *Tracer Research* and *Mediterranean*, the provision should be narrowly construed and only those disputes relating to interpretation of the agreement are arbitrable. *Cape Flattery Limited v. Titan Maritime, LLC*, 647 F.3d 914 (9th Cir. 2011). The court summarized the cases as follows:

> *Mediterranean* established that under an arbitration agreement covering disputes "arising under" the agreement, only those disputes "relating to the interpretation and performance of the contract itself" are arbitrable. *Tracer* similarly held that when a tort claim constitutes an "independent wrong from any breach" of the contract it "does not require interpretation of the contract and is not arbitrable." *Tracer* further clarified that a tort claim is not arbitrable just because it would not have arisen "but for" the parties' agreement.

*Id.* at 924 (citations omitted).

In *Cape Flattery*, the court construed the relevant agreement narrowly because the agreement's language mirrored that in *Mediterranean* and *Tracer*. Specifically, the agreement stated that "[a]ny dispute arising under this Agreement" is arbitrable. *Id.* at 921. The Court finds this line of cases inapplicable to the present case because the relevant language here is not limited to disputes arising under the agreement. Instead, the contracts use broader language such as "any dispute *arising from my enrollment*." If the agreements to arbitrate were limited to only those disputes arising under the relevant enrollment *agreements*, rather from the student's enrollment, generally, then *Cape Flattery's* reasoning would apply. However, here, the relevant provisions are not limited to disputes

"arising hereunder," "arising under," and/or "arising out of" the agreements. *Id.* at 922. Instead, they include expansive language such as "any and all claims," "any dispute," "any dispute between us," and "any dispute between [the student and the School]," without reference to the agreements.[7]

Because the instant language is not limited to disputes arising under the relevant agreements, the narrow rule of construction applied in *Mediterranean* and *Tracer* does not apply here. Construing these provisions liberally, mindful of the strong federal policy favoring arbitration, the Court concludes that each Plaintiff's claims must be submitted to individual arbitration, with the exception ofr the claims discussed below.

### C. California Consumer Statutes

Plaintiffs argue they will be unable to vindicate their statutory rights as private attorneys general if they are forced to arbitrate their Unfair Competition ("UCL"), False Advertising ("FAL"), and Consumer Legal Remedies Act ("CLRA") claims. (Opp'n at 12.) Plaintiffs assert that the injunctive relief sought under these statutes, by Plaintiffs on behalf of the general public, cannot be sent to arbitration. (*Id.* at 14.) Plaintiffs cite to *Broughton v. Cigna Healthplans of California*, 988 P.2d 67, 78-79 (Cal. 2003), for the proposition that public injunction actions brought under the CLRA are not arbitrable. (*Id.*) Plaintiffs contend this rule was extended to FAL and UCL claims by *Cruz v. Pacifware Health Sys., Inc.*, 66 P.3d 1157 (Cal. 2003). Because Plaintiffs seek an injunction on behalf of the public, and the public has not entered into an arbitration agreement with Defendants, Plaintiffs reason that the obligation to arbitrate cannot be imposed here. (*Id.* at 16.)

In reply, Defendants argue that *Concepción* leads to the conclusion that the FAA preempts California's rule exempting public injunctive relief claims from arbitration. (Reply at 12 (citing *Arellano v. T-Mobile USA, Inc.*, No. C 10-05663 WHA, 2011 WL 1842712, *2 (N.D. Cal. May 16, 2011).)

The Northern District of California recently considered this question in *Nelson v. AT&T Mobility, LLC*, No. C10-4802 TEH, 2011 WL 3651153 (N.D. Cal. Aug. 18, 2011). In *Nelson*, the plaintiff sought only injunctive relief under the UCL and CLRA. *Id.* at *1. Defendant moved to compel arbitration, and plaintiff argued that requests for public injunctive relief are nonarbitrable, just as Plaintiffs do here. After considering *Broughton* and *Cruz*, the Court concluded that the state law rules set forth in those cases are the type of state laws *Concepción* concludes are preempted by the FAA. *Id.* at *2. Following *Arellano*, as well as numerous other district court decisions by other judges of this Court, as well as the Northern District of California, the court concluded that the Supreme Court has made clear that a state "'cannot require a procedure that is inconsistent with the FAA' regardless of

---

[7] Plaintiffs' claims lend support to the interpretation that "enrollment" is a period of time in which students are enrolled in school, as opposed to "enrollment agreements" which is a reference the contracts themselves.

how desirable that procedure may be." *Id.* at *4 (*quoting Concepción*, 131 S. Ct. at 1753).) *See also Kaltwasser v. AT & T Mobility LLC*, — F. Supp. 2d —, No. C 07–00411, 2011 WL 4381748, *7 (N.D. Cal. Sept. 20, 2011) (compelling arbitration of UCL, FAL, and CLRA claims); *In re Gateway LX6810 Computer Prods. Litig.*, No. SACV 10–1563-JST (JEMx), 2011 WL 3099862, *3 (C.D. Cal. July 21, 2011) (not reported) (ordering injunctive relief claims under the CLRA and UCL to arbitration).

The Court disagrees with this line of cases. The California Legislature's decision to allow citizens to bring injunctive relief claims under the CLRA, UCL and FAL *on behalf of the public* is not inconsistent with the FAA. Notwithstanding *Concepción's* mandate that state law cannot prohibit arbitration of certain types of claims, the Supreme Court previously acknowledged that "not . . . all controversies implicating statutory rights are suitable for arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985). In *Mitsubishi Motors*, the Court found that the antitrust claims at issue were covered by the arbitration agreement and no external constraints foreclosed the arbitration of those claims. The Court approved of the lower court's two-step approach to 1) determine whether the statutory issues were covered by the arbitration agreement, and 2) consider "whether legal constraints external to the parties' agreement foreclose[] the arbitration of those claims." *Id.* at 628. The Court explained:

> Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable. . . . By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.

*Id.* at 627-28.

Whether certain statutory claims were intended to be kept out of arbitration depends on a statute's text, the legislative history, or an "inherent conflict" between arbitration and the statute's underlying purpose. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). "Throughout such an inquiry, it should be kept in mind that 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 24).

The Supreme Court has also addressed, to some extent, the role the public interest has in the arbitrability of certain statutory claims. Where the public benefit of statutory actions is merely incidental to the pursuit of a private remedy, the Supreme Court has found the claims arbitrable. *See Mitsubishi Motors*, 473 U.S. at 627 (statutory antitrust claims arbitrable); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 241-42 (1987) ("The private attorney general role for the typical RICO plaintiff is simply less plausible than it is for the typical antitrust plaintiff, and does not support a finding that there is an irreconcilable conflict between arbitration and enforcement of the RICO statute.").

In *Broughton*, the California Supreme Court interpreted the Supreme Court decisions regarding the public interest to mean "when the primary purpose and effect of a statutory remedy is not to compensate for an individual wrong but to prohibit and enjoin conduct injurious to the general public, i.e., when the plaintiff is acting authentically as a private attorney general, such a remedy may be inherently incompatible with arbitration." *Broughton*, 21 Cal. 4th at 1077. Without deciding whether arbitrators may ever issue a permanent injunction, the *Broughton* court focused on the fact that the plaintiff was functioning as a private attorney general, "enjoining future deceptive practices on behalf of the general public." *Id.* at 1079-80. Under such circumstances, the court found that arbitration was not a suitable forum, and the California Legislature did not intend for the injunctive relief sought by the plaintiff to be arbitrated. *Id.* at 1080. While the purpose of arbitration is to voluntarily resolve private disputes, the purpose of the injunctive relief provision of the CLRA is to remedy a public wrong. *Id.* The court went on to say:

> Whatever the individual motive of the party requesting injunctive relief, the benefits of granting injunctive relief by and large do not accrue to that party, but to the general public in danger of being victimized by the same deceptive practices as the plaintiff suffered. In this important respect, the injunctive relief at issue in this case differs from the antitrust treble damages remedy considered in *Mitsubishi Motors*, in which any public benefit was merely incidental to private compensation. In other words, the plaintiff in a CLRA damages action is playing the role of a bona fide private attorney general.

*Id.* (citations omitted).

The court concluded that this holding did not contravene the FAA because, "although the [Supreme Court] has stated generally that the capacity to withdraw statutory rights from the scope of arbitration agreements is the prerogative solely of Congress, not state courts or legislatures, it has never directly decided whether a legislature may restrict a private arbitration agreement when it inherently conflicts with a public statutory purpose that transcends private interests." *Id.* at 1083. Moreover, nothing in the FAA's legislative history "suggest[s] that Congress contemplated 'public injunction' arbitration within the universe of arbitration agreements it was attempting to enforce." *Id.* "Although both California and federal law recognize the important policy of enforcing arbitration agreements, it would be perverse to extend the policy so far as to preclude states from passing legislation the purposes

of which make it incompatible with arbitration, or to compel states to permit the vitation through arbitration of the substantive rights afforded by such legislation." *Id.*

The Court agrees with *Broughton* that the Supreme Court has implicitly recognized where enforcement of a public right, as opposed to resolution of a private dispute, is the primary purpose of a statute, an "inherent conflict" with arbitration may arise. The claims at issue here are distinguishable from the arbitrable antitrust and RICO claims addressed in *Mitsubishi Motors* and *McMahon*, respectively, because the primary purpose of an injunctive relief action under the CLRA, UCL, and FAL is to protect the public. While state law cannot prohibit outright the arbitration of a particular type of claim under *Concepción*, *Broughton* and *Cruz* do not prohibit arbitration of all injunctive relief claims. Instead, they provide a framework for analyzing whether injunctive relief claims are arbitrable. *See In re DirectTV Early Cancellation Fee Marketing and Sales Practices Litigation*, --- F. Supp. 2d ----, No. ML 09–2093 AG (ANx), 2011 WL 4090774, *9 (C.D. Cal. Sept. 6, 2011) (denying motion to compel arbitration of UCL and CLRA injunctive relief claims).

The Court cannot jump to the conclusion that public injunctive relief claims under state law must go to arbitration due to the preemptive effects of the FAA. As an initial matter, it is not clear that Congress intended the FAA to sweep public injunction arbitration within its purview. Accordingly, declining to compel arbitration of these claims does not suggest a conflict with the FAA. Instead, the Court finds the better approach to be applying the test from *Mitsubishi Motors*. 473 U.S. at 628. Having found that the relevant agreements encompass Plaintiffs' statutory injunctive relief claims, the Court next asks "whether legal constraints external to the parties' agreement[s] foreclose[] the arbitration of those claims." *Id.* Because Plaintiffs' injunctive relief claims seek to enforce a public right, there is an inherent conflict with sending these claims to an arbitrator. *See Broughton*, 21 Cal. 4th at 1080 (discussing compelling reasons why arbitration is not the proper forum for vindicating a public right). *See also In re DirecTV*, 2011 WL 4090774 at *9 (public injunctive relief component of UCL and CLRA claims not sent to arbitration where plaintiffs, as private attorney generals, sought to remedy defendant's practice of charging improper early cancellation fees to customers).

Here, Plaintiffs seek to prevent Defendants from deceiving vulnerable consumers, such as former military service personnel and low-income individuals, about what it means to enroll at one of Defendants' institutions, namely, the true cost of attendance, quality of education, nature of accreditations, and job prospects upon graduation. Plaintiffs liken Defendants' alleged scheme to that of subprime mortgage lenders who recently triggered the most severe financial crisis in recent history. Similar to those lenders, Defendants have identified an easy source of credit in federal student loans, including Title IV federal financial aid as well as military tuition assistance programs such as the Post-9/11 GI Bill. Defendants exploit a vulnerable consumer population by encouraging students to borrow amounts they will never be able to pay back, let alone ever discharge in bankruptcy, ruining the students' financial future for life. Defendants are able to tap into this easy source of credit, realize significant profits, and pass all of the down-side credit risk on to the students. Not only are the students harmed, but since the loans are federally guaranteed, U.S. taxpayers subsidize this scheme at the

expense of the students and for the benefit of Defendants' bottom line. Plaintiffs allege that in the past year, these practices have been investigated by the Department of Education, the Government Accountability Office, and the Higher Learning Commission, and they have also been considered by Congress. Plaintiffs' desire to obtain injunctive relief to protect the public, including protecting the interests of current and potential students, members of the military, and U.S. taxpayers, is clearly in the public interest. Legal constraints such as the inability of arbitrators to enter an injunction affecting non-parties, as well as the inability to oversee injunctive remedies designed to protect the public as a whole create an inherent conflict and make arbitration unsuitable in this case.

In conclusion, because the statutory purpose of the injunctive relief provisions of the UCL, FAL, and CLRA and the public interest concerns in this case cannot likely be met through arbitration, because there is no apparent conflict with the FAA, and because *Concepción* does not take a position on the arbitrability of public injunction actions,[8] the Court denies the motion as to the injunctive relief component of these three claims. To the extent California law prohibits arbitration of certain types of claims, these laws are overruled by *Concepción*. However, to the extent these claims may be read as consistent with the FAA, and falling under the limited public interest exception envisioned by *Mitsubishi Motors* and *McMahon*, the claims will not go to arbitration.

### D. Stay or Dismissal of Proceedings

Defendants move to have these cases dismissed or stayed pending the completion of arbitration. (Muñiz Mot. at 9; Ferguson Mot. at 10.) Because the Court is satisfied that most of the claims may be sent to arbitration, a stay as to those claims is appropriate under 9 U.S.C. § 3. Only Plaintiffs' public injunctive relief claims insofar as they seek to protect the public, as opposed to Plaintiffs' individual interests, may proceed before the Court.

### IV. Conclusion

For the foregoing reasons, Defendants' motions to compel arbitration are granted in part and denied in part. Plaintiffs' public injunctive relief claims may proceed and the remaining claims are hereby stayed. As to each Plaintiff's stayed claims, Plaintiffs shall proceed to individual arbitration according to the terms of the parties' agreements.

The Clerk shall serve this minute order on all parties to the action.

---

[8] The California Court of Appeal recently noted that the Supreme Court has not addressed whether the FAA preempts California laws whereby a citizen sues as a proxy for enforcement of state laws. *Brown v. Ralphs Grocery Co.*, 197 Cal. App. 4th 489, 503 (2011) (noting that *Concepción* did not address California's Private Attorney General Act of 2004, and continuing to follow what the court believes to be California law).